### 19475

EMMANUEL BAPTIST CHURCH, Respondent, v. SOUTHERN MUTUAL CHURCH INSURANCE COMPANY, Appellant.

(191 S. E. (2d) 255)

*Messrs. Joseph L. Nettles,* and *Seigler, Seigler & Earle,* of Columbia, *for Appellant,*

*Messrs. James P. Mozingo, III* and *Baker & Ethridge,* of Darlington, *for Respondent,*

August 28, 1972.

BUSSEY, Justice:

In this action at law the plaintiff-respondent seeks to recover upon a fire insurance policy issued by the defendant-appellant. By consent the cause was tried by the court without a jury. Appeal is from the judgment of the lower court awarding plaintiff judgment for the face amount of the policy, to-wit: $113,000.00, together with interest and attorney's fees.

Appellant's brief frames and presents three questions for our consideration and each of these will be hereafter fully stated and discussed. The facts of the case, either uncontested or found by the court below and supported by competent evidence, are substantially as follows. The respondent, Emmanuel Baptist Church, is located on the boundary of Hartsville, South Carolina, and for brevity it will be referred to simply as Emmanuel. Prior to 1960, Emmanual had fire insurance on its church building in the amount of $50,000.00, with the appellant Southern Mutual Church Insurance Company, which for brevity will be referred to simply as Southern. In that year Emmanuel expanded its building and after completion thereof Jack Smith, a deacon and member of the Building Committee, was authorized to secure additional insurance because of the new addition. Mr. Smith is a railroad engineer but also conducts an insurance agency and was and is an agent for Nationwide Mutual Fire Insurance Company, which will hereinafter be referred to simply as Nationwide. On November 7th, 1960, Mr. Smith wrote to Southern advising it of the enlargement of Emmanuel's building and requesting additional fire insurance coverage in the amount of $100,000.00 on the building plus $13,000-.00 coverage on the contents. Southern replied on November 9th, offering to write only $63,000.00 additional insurance on the building and contents, instead of the amount applied for. Such offer was accepted by Emmanuel and from that time forward Southern afforded Emmanuel coverage

in the total amount of $113,000.00, its last policy being issued July 18, 1966 to expire on July 18, 1969.

In 1963 Emmanuel again undertook an enlargement of its building, constructing a new wing, and Southern was requested to increase the amount of its coverage by another $50,000.00, but Southern declined to do so. Mr. Smith was then authorized to obtain additional coverage in the amount of $50,000.00 from Nationwide, which policy was issued July 8, 1963 with an expiration date of July 8, 1968. About February 1967, Emmanuel again undertook a substantial enlargement program at a cost of approximately $225,-000.00. A builder's risk policy in the amount of $200,000.00 was issued by Nationwide on February 24, 1967 to expire on February 24, 1968, covering the addition then under construction.

In January 1968, Mr. Schmeitzel, a commercial underwriting specialist for Nationwide, called Mr. Smith to remind him that the builder's risk policy was for only one year and that dependent upon whether construction had been completed, such policy needed to either be rewritten or replaced with some permanent coverage and he suggested that a multi-peril policy be considered. This type of policy was relatively new to Smith; an application therefor required the completion of a number of forms and at that time none of Nationwide's agents were given authority to bind multi-peril coverage. Applications for such coverage had to be submitted to the general office and also to the South Carolina Inspection Rating Bureau for the purpose of obtaining average rates.

Mr. Smith discussed the matter with a Mr. Faile, then chairman of the Board of Deacons of Emmanuel and also a trustee for the church. Neither of these parties had any authority to act for or bind Emmanuel. Only the congregation of Emmanuel has the authority to bind the church to any commitment in excess of $100.00, the authority of even the Board of Deacons being limited to matters involving $100.00 or less. Realizing, however, that the church would

be grossly underinsured with the builder's risk policy expiring, these two decided to apply to Nationwide for a multiperil policy which would provide $450,000.00 fire coverage on the buildings and $50,000.00 on the contents; find out whether such amount could be obtained and what it would cost for the purpose of submitting the information to the congregation.

The various forms necessary for such an application were attempted to be completed by Mr. Faile and Mr. Smith and forwarded to Mr. Schmeitzel who received the same on February 5th. Due to unfamiliarity with the forms, there were errors and omissions and repeated delays, the forms being sent back and forth between Schmeitzel and Smith, and in one instance the forms, through error, were mailed to a church named Immanuel at some undisclosed location. On March 7th, Schmeitzel gave Smith the authority to bind coverage in the amount needed and returned the various forms to Smth for further attention. Such forms were forwarded back to Mr. Schmeitzel on March 17th and received in his office on March 19th, prior to the fire which occurred on the night of March 19th. Thus, at the time of the fire Emmanuel had coverage in the amount of $113,000.00 with Southern and $50,000.00 with Nationwide on the policy issued in 1963, and the benefit of an oral binder for additional coverage resulting from the dealings between Schmeitzel and Smith.

As to such binder, Mr. Smith testified as to his concern about lack of coverage, his telephone calls to Mr. Schmeitzel thereabout and quoted Mr. Schmeitzel as follows:

" 'Well, now Jack, you know, I will tell you this much, you know as an agent we will at least cover you as much as you ask for until we can review it.' "

\* \* \*

" 'Well, Jack, you know that we will insure you until we can get such a policy to review and all and come to some agreement as to whether we can write that much and all,

we will protect you as an agent.' That is all the agreement we ever had."

Mr. Smith further testified that in applying to Nationwide for the multi-peril coverage, it was intended by him and Mr. Faile to secure such coverage in addition to the coverage already carried with Southern; that the church had always carried coverage with Southern and that there was no thought, discussion or intention whatever of canceling or replacing Southern's coverage. The testimony of Mr. Faile is confirmatory.

Mr. Schmeitzel confirmed that he had given Mr. Smith authority on March 7th "to bind coverage in the amount needed." At the time of the fire, however, none of the concerned parties knew what the rate would be; just how much the coverage would be if a policy were ever issued, nor whether the policy could be afforded, or would be accepted, by the congregation of Emmanuel. The binder authorization to Smith had not been communicated to Emmanuel.

At the time of the fire, Emmanuel's building or buildings had a value of nearly $600,000.00, exclusive of furniture and contents. Total damage to buildings and contents amounted to approximately $365,000.00. Both Southern and Nationwide were promptly notified of the fire loss. After some months, Southern denied liability, contending that Nationwide's coverage was either coverage in substitution fo Southern's additional coverage in violation of the terms of Southern's policy and that in either event, Southern was not liable for any portion of the loss. Nationwide took the position that Southern was liable for the face amount of its policy but agreed to settle the claim of Emmanuel by paying the sum of $252,744.51, and further agreeing to pay the remaining loss up to the amount of $113,000.00 should it be legally determined that there was no liability on the part of Southern. As a part of the settlement agreement with Nationwide, Emmanuel was required to prosecute this action at its expense to determine the issue of the liability of Southern.

Appellant Southern's first stated question is as follows:

"Does the substitution of the one insurance contract for another operate to cancel the policy for which the second is substituted?"

Under this question Southern argues that its policy was, in effect, canceled by substitution of the coverage afforded by Nationwide's oral binder. It relies on certain decisions which have held that the procuring of new insurance, before the expiration of the term of existing insurance, with the intent to have the new insurance take the place of the existing insurance, and with no intent thereby to acquire additional insurance, constitutes in law an effective, voluntary cancellation of the existing insurance.

Appleman, Insurance Law and Practice, Sec. 4225, contains, *inter alia,* the following:

"Procuring new insurance to commence before the expiration of existing insurance, without an intent to acquire additional insurance, has been held by some courts to constitute a voluntary cancellation by the insured. * * * However, the cancellation of a policy by the insured requires a clear and unequivocal present intention to cancel. In addition, the mere intention to cancel a policy will not suffice to effect cancellation; such intent must be shown by some act clearly expressing that intent. Accordingly, most courts have held that the mere obtaining of new insurance with the intention that it should take the place of the existing insurance will not, by itself, effect a termination of the original insurance. And obviously where there was never any acceptance of the second policy as a substitute for the first policy, the first insurer cannot be considered to have been released from its liability."

The rule of cancellation by substitution is the subject of an annotation in 3 A. L. R. (3d) 1058, *et seq.* The only South Carolina case called to our attention wherein the Court applied such rule is *McCormack v. Equitable Fire Ins. Co.,* 102 S. C. 473, 86 S. E. 1059. Assuming the soundness of

that decision, such is clearly distinguishable, on the facts, from the instant case.

The lower court found as a fact that at the time of the fire there was no existing intent on the part of Emmanuel to cancel its coverage with Southern. Such finding of fact is, in this law case, binding upon us since it is fully supported by the evidence. Actually, we observe no evidence to the contrary. There being no evidence whatever that the coverage afforded by Nationwide's oral binder was intended or accepted by Emmanuel, or anyone voluntarily acting in its behalf, as a substitute for the coverage of Southern, and all evidence being to the effect that additional coverage was intended, it follows that there was no substitution which would effect a cancellation of Southern's coverage even under the authorities relied upon by it.

Southern's second stated question is as follows:

"Where an insurance policy contains a limitation of total insurance permitted to be carried upon the property, is the policy voided when the insured obtains additional insurance in violation of the limitation?"

Southern contends that under the provisions of its policy such was voided both by the issuance of Nationwide's $50,-000.00 policy and by the oral binder of Nationwide. Southern's policy contained no provision which specifically provided that it would be void in the event that other insurance was obtained, as was the case in *Spann v. Phoenix Ins. Co. of Hartford,* 83 S. C. 262, 65 S. E. 232; *Wynn v. Caledonian Ins. Co.,* 100 S. C. 47, 84 S. E. 306, and *Edwards v. Great American Ins. Co.,* 234 S. C. 404, 108 S. E. (2d) 582. Such express provisions for forfeiture have been held valid and enforced.

The only provision in Southern's policy which deals both expressly and exclusively with "Other Insurance" is the following clause:

"OTHER INSURANCE. Other insurance may be prohibited or the amount of insurance may be limited by en-

dorsement attached hereto." (Capitals are used to indicate bold face black type.)

There was no endorsement attached to the policy which either prohibited or limited the amount of other insurance. The limitation relied upon by Southern as working a forfeiture is contained in the valuation clause which appears in the middle of one page of the policy, rather than as an endorsement, and reads as follows:

"Valuation Clause (Does NOT apply to any of the Perils named in the Extended Coverage)—The Insured and Insurer hereby agree that the value of the building(s) described herein is—and hereby fix the amount of insurance to be carried thereon (including this policy)—respectively as the amount(s) inserted in the blanks provided on the first page of this policy under this caption. The foregoing agreed values are established for insurance purposes only."

It thus appears that the only provision attempting to limit coverage is somewhat buried in the valuation clause and the policy nowhere contains any provision as to the effect, if any, of a violation of such limitation by the insured.

In 6 A Appleman, Insurance Law and Practice, Sec. 4146, we find the following:

" * * * forfeitures of policies are not favored, and provisions therefor will be construed against those for whose benefit they were imposed. Nor will forfeitures be declared by implication. * * * Since the courts look with disfavor upon forfeitures, the trend of modern authority is to hold that there is no forfeiture if the breach of condition or warranty did not contribute to the loss, or did not increase the risk at the time of the loss."

The only provision in Southern's policy which deals both expressly and exclusively with "other insurance" would certainly lead the average person to believe that other insurance was neither prohibited nor limited since no endorsement to that effect was attached to the policy. It is elementary that provisions of an insurance policy

will be construed most strongly against the insurer and favorably toward the insured wherever there is any room for doubt or need for construction. Factually, it is clear that Emmanuel was not overinsured and that any acquisition of additional coverage from Nationwide did not in any manner contribute to the loss nor increase Southern's risk. We are satisfied that there was no error on the part of the lower court in holding that Emmanuel did not forfeit its coverage with Southern by acquisition of additional coverage with Nationwide.

Finally, it is contended that the lower court erred in awarding Emmanuel an attorney's fee in the amount of $7,500.00. We agree and to that extent we reverse. We quote the following from the fairly recent case of *Townsend v. Singleton*, 257 S. C. 1, 183 S. E. (2d) 893 (1971):

"We have held that recoverable damages do not include the expense of employing counsel except when so provided for by contract or statute. *First Nat. Bank of Chillicothe v. McSwain*, 93 S. C. 30, 75 S. E. 1106; *United States Rubber Co. v. White Tire Co.*, 231 S. C. 84, 97 S. E. (2d) 403 and *Rimer v. State Farm Mut. Auto Ins. Co.*, 248 S. C. 18, 148 S. E. (2d) 742."

The respondent petitioned us to be allowed to argue against the foregoing line of decisions and urged that such should be overruled. We are not, however, convinced that we should do so. Respondent also contends that under the principles enunciated in *Addy v. Bolton*, 257 S. C. 28, 183 S. E. (2d) 708 (1971), the award of an attorney's fee should, in any event, be affirmed. We regard the *Addy* decision as clearly distinguishable.

The Judgment of the lower court is reversed insofar as it awarded an attorney's fee but in other respects it is affirmed and the cause remanded for entry of judgment accordingly.

Affirmed in part and reversed in part.

Moss, C. J., and Lewis, Brailsford and Littlejohn, JJ., concur.